**Billie ASHLEY, Plaintiff,**

**v.**

**Steven SUTTON, et al., Defendants.**

**Civil No. 06–063–HU.**

United States District Court, D. Oregon.

June 26, 2007.

Michelle R. Burrows, Portland, OR, for Plaintiff.

Gerald L. Warren, Kenneth S. Montoya, Salem, OR, for Defendant.

## ORDER

HAGGERTY, Chief Judge.

Magistrate Judge Hubel has issued a Findings and Recommendation [46] in this action. It recommends that plaintiff's Motion for Partial Summary Judgment [17] be denied, and defendants' Motion for Summary Judgment [21] be granted in part and denied in part.

Both parties filed objections to the Findings and Recommendation and the case was referred to this court. When a party objects to any portion of a Magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate's report. 28 U.S.C. § 636(b)(1)(B); *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981).

The parties' objections were filed in a timely manner. The court has given the file of this case a *de novo* review, and has also carefully evaluated the Magistrate's Findings and Recommendations, the objections, and the entire record. Magistrate Judge Hubel provided a thorough analysis of the facts and circumstances regarding this litigation, and this analysis need not be repeated here. This court concludes that the Findings and Recommendation is sound, correct, and entitled to adoption.

## ANALYSIS

■ Plaintiff's objections are addressed first. Plaintiff accepts the Findings and Recommendation except in one regard: the conclusion that the decision in *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), bars plaintiff's wrongful seizure claim.

The Findings and Recommendation reasoned:

under *Heck*, the plaintiff must show that her conviction has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by the issuance of a writ of habeas corpus.

\* \* \*

But absent any evidence that her convictions have, as of now, been reversed or expunged, she cannot assert a § 1983 claim based on wrongful seizure because

it would necessarily call into question her conviction for resisting arrest. I conclude that [plaintiff's] wrongful seizure claim is barred by *Heck.*

Findings and Recommendation at 37–38.

Plaintiff argues that the Findings and Recommendation erred because the unavailability of habeas relief permits a civil rights action under 42 U.S.C. § 1983 to proceed despite the reasoning of *Heck.* It is true that there is some authority endorsing the idea that the unavailability of habeas relief permits a § 1983 action, "regardless of whether the success of the action would necessarily imply the invalidity of the conviction or sentence." *Huftile v. Miccio–Fonseca*, 410 F.3d 1136, 1141 (9th Cir.2005) (citing *Spencer v. Kemna*, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)); *see also Muhammad v. Close*, 540 U.S. 749, 752 n. 2, 124 S.Ct. 1303, 158 L.Ed.2d 32 (2004); *Nonnette v. Small*, 316 F.3d 872, 875–77 (9th Cir.2002) (in certain limited cases, *Heck* does not bar a § 1983 claim if habeas relief is unavailable).

It is also true that much of *Heck's* analysis—and the analysis of some of its progeny—pertains to "the intersection of the two most fertile sources of federal-court prisoner litigation—the basic federal civil rights statute, 42 U.S.C. § 1983, and the federal habeas corpus statute for state prisoners." *Huftile*, 410 F.3d at 1139 (internal quotation and citations omitted).

However, the Findings and Recommendation relied upon another aspect of *Heck's* scope. The Findings and Recommendation quoted the Supreme Court's reasoning that a § 1983 action "would not lie" in a situation in which a "state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest" because "to prevail in this § 1983 action, [the state defendant] would have to negate an element of the offense of

which [the defendant] has been convicted." Findings and Recommendation at 36 (quoting *Heck*, 512 U.S. at 487 n. 6, 114 S.Ct. 2364).

The Supreme Court addressed this hypothetical situation in its explicit holding that:

in order to recover damages for ... harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of [the plaintiff's] conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Heck*, 512 U.S. at 486–87, 114 S.Ct. 2364 (footnote omitted).

That hypothetical situation has arisen in the facts of this case. The existence of a line of decisions examining *Heck's* applicability in certain cases in which habeas relief was unavailable fails to negate the Findings and Recommendation's correct reasoning that *Heck* also addressed the precise, and independent, situation presented here: a state defendant who has been convicted of and sentenced for a crime similar to intentionally preventing a peace officer from effecting a lawful arrest. The explicit indication from the *Heck* court

is that the state defendant cannot prevail in a § 1983 action because the state defendant would have to negate an element of the offense of which the defendant has been convicted. *Heck*, 512 U.S. at 487 n. 6, 114 S.Ct. 2364. The Supreme Court made no exception in these circumstances for instances in which that state defendant was not incarcerated or otherwise had no involvement with habeas relief. Plaintiff's objections are overruled.

Defendants also object to the Findings and Recommendation. Defendants challenge the conclusions that their motion for summary judgment on plaintiff's claims for excessive force and battery claims, and on the qualified immunity defense, should be denied. Specifically, defendants contend that the Findings and Recommendation erred in (1) ignoring authorities that suggest that determining the reasonableness of police detentions requires a balancing of interests; (2) ignoring that plaintiff's arresting officer had a right to question plaintiff and to give her a lawful order to stop so he could conduct his investigation; (3) denying summary judgment on the question of excessive force; (4) denying summary judgment to defendant Gallaher under a "ratification theory;" and (5) denying summary judgment to Officer Sutton on plaintiff's battery claim.

These objections reiterate argument and analysis already presented to the Magistrate Judge. The reasoning in the Findings and Recommendation addresses these issues fully, and this court's adoption of the Findings and Recommendation need only summarize that reasoning.

1. *Determining reasonableness of witness detentions requires a balancing of interests*

Defendants assert that the Findings and Recommendation ignored certain judicial decisions and their teachings that bal-

ancing factors should be considered in determining the reasonableness of a police detention. Defts.' Objections at 1. To the contrary, the Findings and Recommendation provided a careful analysis of the applicable law regarding police detentions. Findings and Recommendation at 17–26. Defendants complain, essentially, that the balancing factors that they rely upon should have compelled a favorable summary judgment ruling. Instead, the Findings and Recommendation concluded correctly that summary judgment was inappropriate in light of the circumstances presented. Defendants' objections underscore the existence of material issues of fact and are more properly viewed as factual argument going to the weight of the evidence presented.

### 2. Oregon law regarding plaintiff's detention and seizure

Defendants also contend that the Findings and Recommendation erred because the plaintiff's actions should be construed as "taking flight"—"turning and fleeing into the crowded gymnasium area and ignoring [an officer's] command to stop." Defts.' Objections at 7. Defendants' interpretation of the facts regarding plaintiff's arrest fail to establish that defendants are entitled to judgment as a matter of law on the questions defendants raise. The Findings and Recommendation analyzed the arguments presented correctly.

### 3. There is a jury question on the question of excessive force

Next, defendants assert that the Findings and Recommendation erred in concluding that a jury question exists regarding allegations of excessive force. The Findings and Recommendation reasoned correctly that "[d]etermining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Findings and Recommendation at 26–27 (citation omitted). The Findings and Recommendation concluded that "[f]actual issues preclude summary judgment in Sutton's favor on the excessive force claim." Findings and Recommendation at 28.

Defendants' objections address the law and fact-intensive nature regarding excessive force claims at some length. Defts.' Objections at 12–16. The discussion presented by defendants underscores the necessity of determining the reasonableness of a police officer's actions when evaluating such claims. Id. The Findings and Recommendation's analysis in this regard is sound.

At best, defendants' objections appear to renew their qualified immunity challenge. The Findings and Recommendation correctly noted that "the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is distinct from the inquiry on the merits of the excessive force claim." Findings and Recommendation at 31. Although the Findings and Recommendation reviewed the law regarding qualified immunity thoroughly, a brief summary is appropriate.

"Under the Fourth Amendment, officers may only use such force as is 'objectively reasonable' under the circumstances." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir.2001) (quoting Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

The Supreme Court has established a two-part analysis for determining whether qualified immunity is appropriate in a suit against an officer for an alleged violation of a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150

L.Ed.2d 272 (2001). Under *Saucier*, there is a two-pronged test: courts "must examine first whether the [officers] violated [the plaintiff's] constitutional rights on the facts alleged and, second, if there was a violation, whether the constitutional rights were clearly established." *Desyllas v. Bernstine*, 351 F.3d 934, 939 (9th Cir.2003) (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151).

Determining the reasonableness of a use of force requires a factfinder to balance the nature and quality of the intrusion upon an individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Boyd v. Benton County*, 374 F.3d 773, 778–79 (9th Cir.2004) (citations and internal quotations omitted). The balancing that is required is judged from the perspective of a reasonable officer on the scene, rather than with hindsight, and such balancing means that summary judgment in excessive force cases should be granted sparingly. *Id.* at 779 (citations and internal quotations omitted).

Defendants' objection that the first prong of the *Saucier* test should be resolved in favor of defendants—that no constitutional right enjoyed by plaintiff was violated—is overruled. The Findings and Recommendation concluded correctly that "[i]f the facts are viewed in the light most favorable to plaintiff, Sutton's conduct violated a clearly established constitutional right." Findings and Recommendation at 31–32.

Defendants also contend that *Saucier's* second prong should be construed as favoring defendants:

> Even if the court found that plaintiff had alleged a violation of a clearly established right, Officer Sutton would still be entitled to qualified immunity [regarding the excessive force claim] if he could … have reasonably but mistakenly believed that his … conduct did not violate a clearly established constitutional right. Plaintiff has not shown how any reasonable officer could not believe Officer Sutton's use of force was constitutional.

Defts.' Objections at 15–16 (citation and internal quotation omitted).

As to this second inquiry, the Supreme Court has held that "[i]f the law did not put the officer on notice that his [or her] conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. The Findings and Recommendation acknowledged correctly that, after accepting plaintiff's factual assertions, issues of material fact exist as to whether "a reasonable officer could have believed, in light of the settled law, that his use of force on plaintiff did not violate her constitutional right to be free from excessive force." Findings and Recommendation at 32.[1]

---

1. The Findings and Recommendation further concluded that "[o]n the facts of this case, if Ms. Ashley's version of the facts is believed, defendants have not carried their burden." *Id.* Defendants object to this. It is true that the plaintiff, not the defendant, "bears the burden of showing that the right at issue was clearly established under [*Saucier's*] second prong." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir.2002) (citing *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir.1993)). This court construes the burden to which the Findings and Recommendation referred as defendants' burden to establish the absence of material fact in support of its summary judgment argument. If the Findings and Recommendation misinterpreted where the burdens for *Saucier's* prongs fall (*see, e.g.*, Findings and Recommendation at 30), such an error fails to alter the Findings and Recommendation's otherwise correct conclusions.

### 4. *Gallaher's liability under a ratification theory*

Next, defendants object to the Findings and Recommendation's conclusion that the defendant City "is not entitled to summary judgment on plaintiff's fifth claim for relief, which is grounded on [Police Chief] Gallaher's ratification of Sutton's conduct with respect to both the detention and the use of force." Findings and Recommendation at 35. The Findings and Recommendation concluded that Gallaher is a policymaker for the City on police matters, and his ratification of Sutton's conduct "is sufficient to make the City liable on the basis of a municipal policy." *Id.*

Defendants object, arguing that plaintiff failed to establish "any genuine issue of material fact with regard to Chief Gallaher's 'deliberate indifference' merely because his review of Officer Sutton's report and his knowledge that plaintiff was subsequently convicted by a jury of resisting her arrest and in his experience as an officer, the amount of force used was reasonable to overcome a resisting arrestee in his opinion." Defts.' Objections at 17.

However, this is an inaccurate portrayal of the evidence plaintiff presented. Plaintiff has alleged that Sutton's actions were endorsed and approved by the Chief of Police, an official policymaker. Complaint, ¶¶ 42, 43. The Findings and Recommendation reviewed the relevant evidence and the applicable law:

> The Declaration submitted by Gallaher states, "The amount of force used by Officer Sutton was at all times directed at overcoming Mrs. Ashley's resistance to her arrest." Gallaher Declaration ¶ 6.
>
> A police chief may be liable in his official capacity for the unconstitutional conduct of another if he acquiesces in that conduct. *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991). Gallaher's ratification and approval of Sutton's use of force against Ashley is fatal to his motion for summary judgment. *Id.* If a jury finds that Sutton used excessive force, then it could also find Gallaher liable because he condoned or ratified that use of force. *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.1998).

Findings and Recommendation at 29.

■ This analysis is correct. A municipality also can be liable for an isolated constitutional violation if the final policymaker "ratified" a subordinate's actions and, ordinarily, ratification is a question for the jury. *Christie v. Iopa,* 176 F.3d 1231, 1238–39 (9th Cir.1999) (citing *Fuller v. City of Oakland,* 47 F.3d 1522, 1534 (9th Cir.1995)). The Findings and Recommendation concluded correctly that plaintiff established that there is a genuine issue of material fact regarding whether a ratification occurred.

### 5. *Battery claim*

Defendants' final objection is that the Findings and Recommendation erred in refusing to recommend granting Officer Sutton's Motion for Summary Judgment on plaintiff's battery claim because the "undisputed facts in this case show a minimum amount of force used to effect the plaintiff's arrest and overcome her resistance of [*sic* ] which she was convicted of a crime." Defts.' Objections at 18.

Defendants' assertion that it is "undisputed" that Officer Sutton used a "minimum amount of force" is inaccurate, and insufficient to support their motion for summary judgment on the battery claim. The Findings and Recommendation concluded correctly that there was a jury question as to that claim.

### CONCLUSION

The Magistrate Judge's Findings and Recommendation [46] is adopted. Plain-

tiff's Motion for Partial Summary Judgment [17] is denied, and defendant's Motion for Summary Judgment [21] is granted in part and denied in part, as follows: plaintiff's wrongful arrest claim (claim two) is dismissed; claims three and four against the City are dismissed; and all other motions for summary judgment on plaintiff's excessive force and battery claims, and on the qualified immunity defense, are denied.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

HUBEL, United States Magistrate Judge:

This is an action under 42 U.S.C. § 1983, brought by Billie Ashley against the City of Milton–Freewater (the City), its police chief, Michael Gallaher, and a police officer, Stephen Sutton.[1] Ms. Ashley asserts five claims for relief. The first two are § 1983 claims asserted against defendants Gallaher and Sutton, grounded on violation of the Fourth Amendment, and based on allegations of unconstitutional seizure and use of excessive force. Claims three, four and five are § 1983 claims against the City based on unconstitutional municipal policy; failure to train; and unconstitutional policy through ratification by a policymaker. The last claim is for battery, asserted against Gallagher and Sutton. Ashley seeks economic, noneconomic and punitive damages.

Ashley has filed a motion for summary judgment in her favor on all claims except the battery claim. Defendants move for summary judgment in their favor on all claims; Sutton and Gallaher also seek summary judgment based on their qualified immunity defense.

## Factual Background

On December 14, 2004, Billie Dean Ashley was attending a basketball game at Central Middle School in Milton–Freewater with her husband, Tim Ashley. Their 13–year–old son, Luke, was playing in the game. Shortly after the game started, Tim Ashley moved to a different section of the bleachers because Billie Ashley and a friend were talking. Warren Declaration, Exhibit 1 (deposition of Billie Ashley, hereinafter "Ashley dep.") 25:20–26:4, 27:5–10.

The referee of the basketball game was George Gillette. During the game, Tim Ashley was yelling at the referee from the bleachers. Gillette ejected Tim Ashley from the game. Gillette went to the principal of the school, Steve Carnes, and told Carnes that a parent had yelled profanity at him and he wanted Carnes to remove him from the game. Gillette pointed to an individual who was "kind of by himself on the end." Warren Declaration, Exhibit 4 (deposition of Steve Carnes) 20:3–10, 21:12–15. Carnes recognized the person Gillette was pointing to as Tim Ashley. Carnes dep. 20:9–12, 22:20–22. Carnes did not see Billie Ashley in the stands. Carnes dep. 22:18–19.

Carnes saw Tim Ashley leave the bleachers and walk toward Carnes, at which time Carnes overheard Tim Ashley make a comment to the referee to the effect that, "I'll see you out back after the game," or "I'll be waiting for you out back." Carnes dep. 22:25–23:3, 26:22–27:1. Carnes and Tim Ashley walked out of the gym together, where they were met by Jay Rodighiero, who explained to Ashley that he needed to leave. Carnes dep. 23:4–6, 27:2–4. Tim Ashley argued to Carnes and Rodighiero that he had not

---

**1.** Previously named defendants, Milton–Freewater Unified School District and Steve Carnes, the principal of Central Middle School in Milton–Freewater, have been voluntarily dismissed from the case, thereby mooting a claim against the school district.

used profanity and should not have to leave, but the latter two insisted that under OSAA rules, because the referee had ejected him, he had to go. Carnes dep. 27:14–28:2. Ashley and Carnes walked out of the gym together, and Ashley got into his truck. Carnes dep. 28:14–16, 29:19–22. But about 15 seconds later, Ashley returned to the gym. Carnes dep. 29:23–30:3. Carnes and Rodighiero had another conversation with Ashley and Carnes escorted Ashley out again. Carnes dep. 30:9–31:2. Carnes watched Ashley drive away. Carnes dep. 31:3–5. Carnes then decided to call the police because he felt that Tim Ashley's threat to the referee "made the place unsafe," and because he wasn't sure Ashley was gone for good. Carnes dep. 31:11–17.

Billie Ashley, the plaintiff, approached Carnes in the hallway outside the gym. Ashley dep. 41:15–17; Carnes dep. 36:14–17. She introduced herself to Carnes, told him she understood that her husband had been ejected for swearing at the referee, and said her husband had a head injury which caused him to be "more temperamental and more outspoken than somebody who doesn't have that issue to deal with." Ashley dep. 41:20–42:2; Carnes dep. 36:22–25, 37:17–18. Ashley told Carnes she would be "happy to discuss it with the referee so they had some understanding." Ashley testified that she was "trying to make the peace." Ashley dep. 42:2–4. Carnes has testified that Ashley's demeanor was polite, rational and appropriate. Carnes dep. 38:3–12.

Carnes responded that the police had been called, and that they would probably want information from her, Carnes dep. 37:11–13, 40:13–15, even though Carnes knew Billie Ashley had not been sitting near Tim Ashley at the time of the incident. Carnes dep. 38:14–25. Ashley re-

sponded, "I'm not giving them anything." Carnes dep. 41:18–24.

Meanwhile, defendant Sutton had received information from his dispatcher that there had been disorderly conduct and a threat by a fan at the basketball game. Warren Declaration, Exhibit 2 (Sutton deposition) 34:11–13. Sutton was told that the fan was a male who had been watching the game. Sutton dep. 57:4–15. Sutton testified that he did not go to the school to make an arrest, but only to "investigate a report of a crime," that crime being "disorderly conduct and/or menacing." Sutton dep. 60:16–23.

When Sutton arrived at the school, he knew the suspect had made a threat, and believed the suspect might be a threat to others, but did not know where he was. Sutton dep. 67:15–22, 67:23–25. Before going into the school, Sutton had no information suggesting that Billie Ashley was involved in the incident he was investigating, or that she was even at the school. Sutton dep. 57:19–25.

Sutton arrived at the school and approached Carnes and Billie Ashley. Carnes identified Ashley to Sutton as the wife of the man who had been ejected and again said something about her giving the police information, or "he'll need to talk to you," see Sutton dep. 63:2–9, even though Carnes thought Sutton had heard Ashley's comment about "I'm not giving them anything" as Sutton walked up. Carnes dep. 42:2–12, 46:22–25, 47:5–9. Carnes testified that had Ms. Ashley not been present, he would have given Sutton whatever information was needed about Mr. Ashley. Carnes dep. 42:13–19. Sutton has testified that as he walked up to Carnes and Billie Ashley, Carnes introduced Billie Ashley to Sutton and told Billie Ashley that Sutton was "going to have some questions." Sutton dep. 63:2–9.

According to Carnes, Sutton's first words as he walked up to Carnes and Ashley were "stop right there," and a comment that if Ashley did not give him the information he wanted, he could arrest her. Carnes dep. 47:6–12, 14–16. However, Sutton has testified that he first introduced himself to Ashley and advised her that he wanted to "talk to her husband" and get their address. Sutton dep. 63:10–20. Ashley has testified that Sutton "asked in a very demanding tone" for Tim Ashley's name, date of birth, and address. Ashley dep. 45:13–23.

Sutton had no information indicating that Billie Ashley had been involved in the incident with the referee. Sutton dep. 63:25–64:5. However, Sutton testified that he "had reason to believe" that she "was a party to it." Sutton dep. 64:7–9.

Sutton is under the impression that a "party" to a crime is the same as a witness to a crime:

Q: Did you tell her she was a party to the incident?

A: I apparently did.

\* \* \*

Q: So, if she's a party to the incident, is she a suspect in a crime?

A: No ma'am.

Q: So what is she?

A: A witness.

Q: And witnesses are obligated to provide police officer information when they're asked?

A: Yes. Not police officer information. Their basic information: name, date of birth and address.

Sutton dep. 72:7–24. However, the evidence is that Sutton did not ask Ms. Ashley for *her* name (which he already knew) or for *her* date of birth, but rather for her husband's date of birth and their address.

Sutton dep. 73:6–25. Sutton has testified that he did not regard Billie Ashley as a suspect. Sutton dep. 82:14.

Sutton was then asked:

Q: What information did you have?

A: She was there.

Q: How do you know?

A: How do I know she was there?

Q: Yes.

A: She was standing with Mr. Carnes when I walked in.

Q: Was she there in the gym when the incident occurred with Mr. Ashley?

A: I was reasonably believing she was.

Q: How do you know that?

A: It's been my experience that spouses often go to games together.

Q: Well, do you have any specific factual basis that she was there during the game?

A: No factual basis.

Sutton dep. 64:10–25.

Sutton was then asked,

Q: Could you tell me what facts you were basing your reasonable belief upon?

A: The fact I received a call to respond, I responded relatively quickly there, and she was on scene when I arrived.

Sutton dep. 65:5–9.

Sutton has testified that he asked Ashley for the name of her husband and their address, and that she told him she wasn't going to give him the information, and he could look it up. Sutton dep. 67:8–14, 68:1–6. Ashley has testified that Sutton told her he wanted her husband's date of birth as well. Ashley dep. 48:21–23.

Sutton then told Ashley "there were easy ways to take care of this and there were hard ways to take care of this," Sut-

ton dep. 68:22–25, and if she did not provide the information he wanted, she could be arrested. Sutton dep. 69:5–11. Sutton believed that because he had a "reasonable suspicion" that Ashley was a witness to the incident, he had the right to arrest her for interfering with an investigation if she did not answer his questions. Sutton dep. 69:11–22. Sutton has testified that if a witness "willfully" refuses to provide information, "I have a right to detain them further to gather that information." Sutton dep. 74:6–8. Sutton explained,

Q: So you have the right to detain a witness until they give you the information you want?

A: Until I receive the information I need.

Q: So they're not free to leave?

A: This is correct.

Q: They're under arrest?

A: No.

Q: What's the difference between not being able to leave and not—and being under arrest?

* * *

A: She was potentially going to be free to leave after she—after I received my basic information.

Q: So, until you got what you want from her, she was detained.

A: For a reasonable time period, yes.

Q: What would be a reasonable time period?

A: I can't speculate on that.

Q: What if she never gave you the information?

A: Then I would detain her to the police department and attempt to locate it there.

Q: Detain her to the police department. Would you arrest her?

A: No, I would not arrest her.

Q: So you'd make her go in your police car to the police station?

A: I have that ability.

Q: Without arresting someone.

A: Under detainment, yes.

* * *

Q: So you can detain a witness until you get pertinent personal information.

A: I can determine who that witness is. They are a party to the crime.

Q: They're a party to the crime when they're a witness?

A: Yes.

* * *

A: My decision was based on the fact that this was a sporting event. She was advised to me to be the wife of a suspect and I had a reasonable belief that wives and husbands would attend sporting events together.

Sutton dep. 74:13–22, 76:2–19, 77:12–18, 85:2–6.

Ashley has testified that she told Sutton she was not going to help him prosecute her husband, and that he could look the information up. Ashley dep. 50:5–7. Ashley states that Sutton told her, "If you don't give me that information right now, you're going to be under arrest," Ashley dep. 50:8–11, and that she responded, "For what?" Ashley dep. 50:17–19. Sutton told her, "For interfering." Ashley dep. 50:21; Sutton dep. 70:7–16. Ashley testified that she responded, "Then arrest me. I'm going in the gym to get my purse." Ashley dep. 50:22, 51:17–22.

Ashley turned away from Sutton and began walking toward the gym. Ashley dep. 52:6–25. Sutton has testified that he

then advised Ashley that she was under arrest and put his hand out in order to place her hands behind her back and take her into custody. Sutton dep. 91:9–19.

The record is unclear as to when Sutton told Ashley she was under arrest. Sutton has testified that he told Ms. Ashley she was under arrest after she said she would not answer his questions, Sutton 91:9–16, 113:1–2; when she walked away from him in the hallway, Sutton 92:2–5; when he grabbed her coat, Sutton 95:1–7; and when he told her to get up from the bleachers, 99:3–4. Carnes and Ashley have both testified that Sutton said nothing as Ashley began to walk away, but followed her and told her to stop. Carnes dep. 47:18–23, 50:17–20; Ashley dep. 52:1–23.

Ashley entered the open doors of the gymnasium. Sutton dep. 91:22–24. Carnes has testified that she was moving in the direction of her purse. Carnes dep. 50:24–51:1. Sutton testified that he followed her, telling her to stop. Sutton dep. 91:25, 92:14–15. Sutton caught up to Ashley as she was approaching the stands, Sutton dep. 92:18–20, grabbed her coat, Sutton dep. 94:22–25, and caused her to "separate from" her coat and fall into the bleachers on her back. Sutton dep. 98:9–25. According to Ashley, she was unaware that Sutton was behind her until Sutton grabbed her coat from behind and pulled it so hard that she was knocked into the bleachers. Ashley dep. 53:1–12, 53:23–25; 54:6–18, 55:15–18.

Sutton testified that he told Ashley to get up and repeated that she was under arrest. Sutton dep. 99:1–4. Sutton pulled out his taser and told Ashley that he was going to count to five and if she "continued to resist," he would use the taser on her. Sutton dep. 99:1–25, 100:1–5; see also Ashley dep. 57:2–3 (Sutton said to her, "You have to the count of five to get up or I'm going to taser you.") Ashley was asking him, "Why are you doing this?" and stating, "I've done nothing wrong." Sutton dep. 100:6–11; Ashley dep. 57:9–10. Sutton was asked at his deposition,

Q: And what was she doing towards you that you believed justified the use of a taser?

A: She was resisting arrest and resisting my attempts to take her into custody.

Q: Did she strike you at all?

A: No.

Q: Did she touch you at all?

A: No.

Q: Did she threaten you verbally with harm?

A: No.

Q: Was she harming or trying to harm anyone else?

A: No.

Sutton 101:8–19.

Sutton subsequently testified that he arrested Ms. Ashley, handcuffed her, and took her into custody because when she entered the gym, she had "started to resist," and was creating a threat to herself and to Officer Sutton. Sutton 120:3–18. In Sutton's opinion, the threat was created because "[w]e were moving. We could create injuries to both of us and/or anyone else in that area." Sutton 120:19–21.

It was Sutton's intention, if Ashley did not stand up, to put the taser on her body and pull the trigger. Sutton dep. 105:9–12. When Sutton got to three, Ashley stood up and began walking out of the gym toward the hallway. Ashley dep. 58:22–24; Sutton dep. 105:13–20. Ashley has testified that she walked out of the gym "so we could finish whatever he was going to continue to do." Ashley dep. 59:9–11. Ashley testified that she was trying to get out of the gym because "everybody was staring," and

"[i]t was a very humiliating, very embarrassing situation." Ashley dep. 59:2–5, 8–11, 14–18. Sutton followed her, placed the taser against the back of her shoulder and pulled the trigger as she walked out of the gym. Sutton dep. 105:20–24; Ashley dep. 60:1–7, 60:22–25; 61:13–18.

Once into the hallway, Ashley turned around to face Sutton, and Sutton used the taser on her stomach because, in Sutton's opinion, Ms. Ashley was "still resisting." Sutton dep. 107:20–108:1; 108:14–16; Ashley dep. 62:15–19. Ashley grabbed the taser and pulled it away from her stomach, saying to Sutton, "Are you enjoying this?" or something to that effect. Ashley dep. 62:20–23. Sutton then pushed Ashley to the wall, using his weight to hold her there, and handcuffed her. Sutton dep. 110:18–111:5. Ashley has testified that Sutton grabbed her left arm behind her back, with her face plastered against the wall, and held her there while the boys came out of the locker room for halftime. Ashley dep. 64:6–9. Ashley's son Luke saw her there. Ashley dep. 64:10–11. Once the boys had returned to the gym, Sutton finished handcuffing Ashley. Ashley dep. 67:23–25.

After Ashley had been handcuffed, defendant Gallaher arrived on the scene, in response to a request for backup from Sutton. Declaration of Michael Gallaher ¶ 3; Ashley dep. 67:15–18; Warren Declaration, Exhibit 2, p. 61. Ashley told Gallaher the handcuffs were hurting her wrists because she had been cuffed over her watch. Gallaher Declaration ¶ 4; Ashley dep. 71:5–7. Gallaher took Ashley outside, removed the handcuffs, handcuffed her hands in front, and put her in a squad car. Gallaher Declaration ¶ 4; Ashley dep. 71:9–12.

From the time Sutton arrived at the school to the time he placed Ashley in handcuffs was approximately four minutes.

Sutton dep. 41:23–42:1. Sutton has acknowledged that he "actually didn't interview anyone" at the school in connection with the incident involving the referee and Tim Ashley. Sutton dep. 51:21–25.

Tim Ashley approached Sutton after Billie Ashley had been placed in the patrol car. Warren Declaration Exhibit 2, p. 61. Tim Ashley suffered a violent seizure after being handcuffed by Sutton, and an ambulance was called. *Id.* at 62. Billie Ashley was taken to the police station by Sutton, where she was cited for interference with a peace officer, disorderly conduct, and resisting arrest, then released. Ashley dep. 72:10–14; Warren Declaration, Exhibit 2, p. 60, 62. Tim Ashley was ultimately mailed a citation for disorderly conduct. Warren Declaration, Exhibit 2, p. 62.

Sutton has testified that he charged Billie Ashley with interference with a peace officer because of "[t]he fact that she failed to give the basic information that I asked for, her address, specifically. And then she also disobeyed direct orders to stop when she tried to move away." Sutton dep. 87:11–14.

Q: What orders did you give her?

A: I advised her she was under arrest; she needed to put her hands behind her back.

Q: So you believe that your order for her to stop so that you could arrest her was a lawful order?

A: I do.

Sutton dep. 87:9–20. Sutton now acknowledges that after arresting Billie Ashley, he learned that refusing to answer questions is not a violation of the Oregon statute that prohibits interfering with a peace officer. Sutton dep. 88:23–89:9. The interference with a peace officer charge was dismissed by the city prosecutor. Ashley dep. 72:16–22.

Billie Ashley was convicted by a municipal jury of disorderly conduct and resisting arrest. Warren Declaration, Exhibit 1, p. 62. Ashley received a suspended sentence on condition that she have no matters before the court for one year and was ordered to pay a fine. *Id.;* Ashley dep. 73:20–22. Ashley appealed the conviction, but her appeal was dismissed on procedural grounds, because Ashley, acting pro se, filed the original notice of appeal in the wrong court. Warren Declaration, Exhibit 3. She has appealed the dismissal of the appeal, and that appeal is pending. Warren Declaration Exhibit 3, p. 1–3.

Defendant Gallaher, Chief of Police for the Milton–Freewater Police Department, has submitted a Declaration stating that he reviewed the facts of the incident involving Billie Ashley, based upon the police report completed by Sutton and interviews of any personnel involved, and concluded that there were

> no City of Milton–Freewater Police Department policies or procedures that were not properly followed in this case. Officer Sutton was at all times attempting to investigate a disorderly conduct and menacing offense and Mrs. Ashley refused to cooperate with his investigation to provide him with the minimal information he was requesting. The amount of force used by Officer Sutton was at all times directed at overcoming Mrs. Ashley's resistance to her arrest.

Gallaher Declaration ¶ 6.

**Standards**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is

not proper if material factual issues exist for trial. *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,* 516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and must draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1257 (9th Cir.2001).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. Assuming that there has been sufficient time for discovery, summary judgment should be entered against a "party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548.

**Discussion**

1. **Constitutionality of Sutton's seizure of Ashley**

 a. *Was there a seizure?*

 ■ A person is "seized" when by means of physical force or a show of authority, his freedom of movement is restrained. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); see also *Doe ex rel. Doe v. State of Hawaii Dept. of Education,* 334 F.3d 906, 909 (9th Cir.2003)(seizure, in constitutional sense, occurs "when there is a restraint on liberty to the degree that a reasonable person would not feel free to leave.").

A seizure violates the Fourth Amendment if it is objectively unreasonable under the circumstances. *Doe*, 334 F.3d at 909. Determination of whether a seizure was reasonable requires a two-step inquiry: first, whether a seizure has occurred, and, if so, whether that seizure was objectively unreasonable under the circumstances. *Id.*

Law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, asking if the individual is willing to answer some questions, putting questions to the individual if the individual is willing to listen, or by offering into evidence in a criminal prosecution his voluntary answers to such questions. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The person approached, however, need not answer any question put to him or her; indeed, she may decline to listen to the questions at all and may go on her way. *Id.* at 497–98, 103 S.Ct. 1319. See also *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Florida v. Bostick*, 501 U.S. 429, 434–35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)(even in absence of a basis for suspecting a particular individual, police may generally ask questions, "*so long as the police do not convey a message that compliance with their requests is required.*") (emphasis added).

When a police officer *detains* a person for the purpose of requiring that person to identify herself, the officer has performed a seizure of her person subject to the Fourth Amendment. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357, (1979)(emphasis added).

The parties do not dispute that there was a seizure. Defendants characterize Sutton's conduct in asking Ashley for her husband's name and their address as a "detention," and acknowledge that the detention escalated into an arrest after Ashley refused to answer Sutton's questions.

b. *Was the initial detention an information-seeking stop?*

In general, a person may not be detained even momentarily without "reasonable, objective grounds for doing so; and his refusal to listen or answer [questions] does not, without more, furnish those grounds." *Royer*, 460 U.S. at 498, 103 S.Ct. 1319; *Mendenhall*, 446 U.S. at 556, 100 S.Ct. 1870.

Defendants nevertheless contend that Sutton's initial detention of Ashley as a "potential witness to a crime" satisfies the Fourth Amendment's reasonableness requirement. The defendants rely on *Illinois v. Lidster*, 540 U.S. 419, 124 S.Ct. 885, 157 L.Ed.2d 843 (2004).

*Lidster* involved brief stops of motorists at a highway checkpoint to ask for information about a recent fatal hit-and-run accident on that highway. As each vehicle drew up to the checkpoint, an officer would stop it for 10 to 15 seconds, ask the occupants whether they had seen anything, and hand each driver a flyer requesting assistance in identifying the vehicle and driver.

As Lidster drove up to the checkpoint, his van swerved, nearly hitting one of the officers. The officer smelled alcohol on Lidster's breath, and directed Lidster to a side street where another officer administered a sobriety test and then arrested Lidster. The Supreme Court upheld the constitutionality of the stop and the arrest.

The *Lidster* Court said:

[T]he law ordinarily permits police to seek the voluntary cooperation of members of the public in the investigation of a crime. "Law enforcement officers do not violate the fourth amendment by

merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1982)[other citations omitted]. That, in part, is because *voluntary* requests play a vital role in police investigatory work. *Id.*

Sutton acknowledged at his deposition that the Milton–Freewater police manual provides that although an officer "may always speak to a citizen provided the citizen wishes to continue to talk with the officer," the manual also states, "Officers should accept that the citizen may refuse to talk to the officer and refuse to identify himself." Sutton dep. 81:6–12. However, Sutton testified that he did not consider his questioning of Ashley to be a "consensual interview" because "[s]he made no effort to want to answer my questions. It wouldn't be what I would qualify as consensual." Sutton dep. 81:15–20.

Regardless of whether Sutton's initial detention of Ashley in the hallway was analogous to an information-seeking highway checkpoint stop, not involving individualized suspicion, there is no dispute that the encounter between Sutton and Ashley did not end there. The question, then, is not whether Sutton had the right to ask Ashley questions, but rather whether he could compel her to answer those questions and arrest her if she refused. I therefore turn to the question of whether Sutton's subsequent curtailment of Ashley's liberty was constitutionally justified.

### c. *Did Sutton have grounds for a Terry stop?*

The defendants argue, on the basis of *Hiibel v. Sixth Judicial District Court of* *Nevada,* 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) that Sutton was free to ask Ashley for the information without implicating the Fourth Amendment, because asking for information is not, by itself, a Fourth Amendment seizure. However, as *Hiibel* makes clear, this is only in the context of a *Terry* stop supported by a reasonable suspicion that the person stopped is engaged in criminal activity.

Our decisions make clear that questions concerning a *suspect's* identity are a routine and accepted part of many Terry stops. See *United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) ("[T]he ability to briefly stop [a suspect], ask questions, or check identification in the absence of probable cause promotes the strong government interest in solving crimes and bringing offenders to justice"); *Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985)("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information"); *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time").

(Emphasis added)

A *Terry* stop [2] requires the existence of "articulable facts supporting a reasonable suspicion that a person has

---

**2.** See *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

committed a criminal offense;" if such facts exist, that person "may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida,* 470 U.S. 811, 816, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985). A reasonable suspicion is more than an "inchoate and unparticularized suspicion or hunch." *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

 Defendants argue that Sutton had a reasonable suspicion that Ashley was "connected to illegal activity as the spouse of a person who had made a threat and was concealing his whereabouts which permitted him to detain her for a limited amount of time to conduct his investigation," and that she was a "party to the disturbance that had taken place at the school." Defendants' Memorandum, p. 9. There is no evidentiary support in the record for either of these contentions.

Ashley's mere status as the spouse of the person who allegedly made the threat does not establish that she was connected to her husband's swearing at the referee or to his threat. Moreover, Sutton has admitted that he had no information indicating that Billie Ashley had been involved in the incident with the referee; that he knew the suspect he sought was male; and that Ashley herself was not the suspect. Sutton dep. 72:16–20; 82:14.

Sutton has said he thought Ashley might have been a witness, or, in his words, a "party," to Tim Ashley's conduct. But he had no factual basis for his belief that Billie Ashley had witnessed anything aside from his assumption that spouses usually attend sporting events together. Sutton never asked Ashley whether she had witnessed the interaction between her husband and the referee.

Because Sutton had no articulable facts supporting a reasonable suspicion that Billie Ashley was involved in criminal activity, this was not a valid *Terry* stop.

### d. *Did Sutton have probable cause to arrest?*

The defendants assert that Sutton had probable cause to arrest Ashley when she walked away from him toward the gym, because he had "probable cause to believe she was committing a crime and interfering with his investigation." Defendants' Memorandum p. 12. Sutton's testimony shows that he arrested Ashley for interfering with his investigation by refusing to answer questions.

 Officers have probable cause for an arrest if at the time of the arrest, the facts and circumstances within their knowledge, and of which they have reasonably trustworthy information, are sufficient to warrant a prudent person's believing that the defendant committed an offense. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *United States v. Henderson,* 241 F.3d 638, 648 (9th Cir.2000). The court looks to the totality of the circumstances known to the officer at the time to determine whether probable cause existed. *United States v. Butler,* 74 F.3d 916, 920 (9th Cir.1996).

 Mere presence in a place where criminal activity is suspected, or mere association with suspects, is not sufficient to provide probable cause for an arrest. See, e.g., *Sibron v. New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)(police lacked probable cause to arrest defendant found talking to narcotics addicts and traffickers); *Ybarra v. Illinois,* 444 U.S. 85, 94–96, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)(police lacked probable cause to search bar patron when police had warrant to search bar and bartender; no criminal activity could be inferred from patron's mere presence in bar); *United*

*States v. Soyland,* 3 F.3d 1312, 1314 (9th Cir.1993)(automobile passenger merely present in car; driver admitted possession of drugs for personal use). Consequently, the mere fact that Billie Ashley was married to the suspect in the case, Tim Ashley, or the fact that she was present in the gym where the incident took place is not sufficient to create probable cause to arrest her.

■ Nor, at the moment when Ashley turned away from Sutton and started walking from the hallway to the gym, was there probable cause to arrest Ashley for interfering with a police officer, because it was not a criminal offense under Oregon law for Billie Ashley to refuse to answer Sutton's questions. The crime of Interfering with a Police Officer is as follows:

A person commits the crime of interfering with a peace officer ... if the person, knowing that another person is a peace officer ...

a) Intentionally acts in a manner that prevents, or attempts to prevent, a peace officer ... from performing the lawful duties of the officer with regards to another person; or

b) refuses to obey a lawful order by the peace officer ...

Or.Rev.Stat. 162.247(1). The evidence does not support a finding that Billie Ashley *acted* in a manner that prevented or attempted to prevent Sutton from performing his duties, and it has been held that mere speech does not constitute such an act. *State v. Lam,* 176 Or.App. 149, 157, 29 P.3d 1206 (2001)(reviewing legislative history and holding that Or.Rev.Stat.

§ 162.247 excludes acts that are entirely verbal).

Defendants have also argued that Sutton had probable cause to arrest Billie Ashley because she refused Sutton's "lawful order to stop so as to allow him to conduct his investigation." Defendants' Memorandum p. 14.[3] Defendants do not specify which order to stop they refer to: Sutton ordered Billie Ashley to "stop right there" when he first walked up to her in the hallway, *before* she refused to answer his questions, and he ordered her to stop as she walked away from him in the hallway toward the gym.

Regardless, Sutton's order to stop was not a lawful order, because her refusal to answer questions did not justify Sutton's order to stop. In *State v. Illig–Renn,* 341 Or. 228, 142 P.3d 62 (2006) the court held that the use of the word "lawful" with "order" in the interfering statute removes from the applicability of the statute an order that is inconsistent with substantive law, including constitutional provisions. Sutton did not have grounds for a *Terry* stop or an arrest. Therefore, he is not entitled to summary judgment on the wrongful arrest claim, based on these arguments. But plaintiff's claim must nonetheless be dismissed on the basis of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), as discussed below.

## 2. Excessive force claim

■ Under the Fourth Amendment, the police may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor,* 490 U.S. 386,

---

**3.** There is no evidence in the record before me that Sutton's decision to arrest Ashley was based on disorderly conduct. His testimony is consistent that his decision to arrest her was based on his conclusion that she had committed the crime of interfering with him by refusing to answer his questions and on her refusal to stop when ordered to. Sutton dep. 69:5–11; 69:11–22; 74:6–8; 74:13–22; 76:2–19; 77:12–18; 85:2–6; 91:9–16; 91:9–19; 92:2–5; 95:1–7; 99:3–4; 113:1–2.

397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *LaLonde v. County of Riverside,* 204 F.3d 947, 959 (9th Cir.2000).

 Generally, excessive force cases are rarely decided as a matter of law, because the Fourth Amendment test for reasonableness is inherently fact-specific. *Headwaters Forest Defense v. County of Humboldt,* 240 F.3d 1185, 1198 (9th Cir.2000), *vacated and remanded for further consideration on other grounds,* 534 U.S. 801, 122 S.Ct. 24, 151 L.Ed.2d 1 (2001), *on remand,* 276 F.3d 1125 (9th Cir.2002). Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id.* Weighing the governmental interests involved requires the factfinder to evaluate such factors as the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, and any other exigent circumstances. *Id.* The essence of the analysis is that the force which was applied must be balanced against the need for that force. *Id.* Thus, where there is no need for force, any force used is constitutionally unreasonable. *Id.,* citing *P.B. v. Koch,* 96 F.3d 1298, 1303–04 & n. 4 (9th Cir.1996).

 Defendants have argued that they are entitled to summary judgment because Sutton's use of the taser on Ashley was justified. They assert it was "used to enforce compliance with an order that had a reasonable security purpose." Defendants' Memorandum p. 14. Sutton has testified that he used the taser to enforce his order to Ashley to stand up after she fell into the stands.

There is no evidence suggesting that Ms. Ashley refused to stand up after she fell into the bleachers. In fact, the evidence is that she did stand up within a few seconds after Sutton began counting. Ashley dep. 58:22–24; Sutton dep. 105:13–20. It is difficult to understand how Sutton's use of the taser would have made Ms. Ashley comply with his order to stand up, since if he had used the taser on her before she stood up, and if the taser had been working properly, Ms. Ashley would have been incapacitated and unable to stand up.

In any event, there is no evidence that the order to stand up had a reasonable security purpose. Sutton has testified that he could have given Ashley a citation for interfering with a peace officer rather than taking her custody. Sutton dep. 118:1–3. Sutton has admitted that Ashley did not present a threat to officer safety or a threat of harm to anyone else. Sutton dep. 118:7–12.

On the other hand, Ashley was convicted of resisting arrest and disorderly conduct. Some coercion or force is allowed when effectuating an arrest. *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). When a reasonable jury could return a verdict for either side, summary judgment is inappropriate. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Factual issues preclude summary judgment in Sutton's favor on the excessive force claim.

The excessive force claim is not precluded by *Heck v. Humphrey,* as discussed below.

a. *Excessive force claim against Gallaher*

Gallaher asserts that this claim should be dismissed as to him because he arrived

on the scene after Ashley had been handcuffed and was not in a position to see the arrest. Further, he argues that the actions he allegedly endorsed did not occur in his presence. He asks that he be dismissed because there is no evidence that he played any role in Ashley's arrest or the manner in which it was conducted.

The Declaration submitted by Gallaher states, "The amount of force used by Officer Sutton was at all times directed at overcoming Mrs. Ashley's resistance to her arrest." Gallaher Declaration ¶ 6.

■■■ A police chief may be liable in his official capacity for the unconstitutional conduct of another if he acquiesces in that conduct. *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991). Gallaher's ratification and approval of Sutton's use of force against Ashley is fatal to his motion for summary judgment. *Id.* If a jury finds that Sutton used excessive force, then it could also find Gallaher liable because he condoned or ratified that use of force. *Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.1998).

I recommend that all the motions for summary judgment on the excessive force claim be denied.

### 3. Are Sutton and Gallaher entitled to qualified immunity?

Sutton and Gallaher assert that they are entitled to qualified immunity.

The test for qualified immunity is set out in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The first inquiry is whether, based upon the facts taken in the light most favorable to the party asserting the injury, the officer's conduct violated a clearly established constitutional right. *Id.* at 201, 121 S.Ct. 2151. If so, the court must then inquire whether the officer could nevertheless have reasonably but mistakenly believed

that his or her conduct did not violate a clearly established constitutional right. *Id.* at 205, 121 S.Ct. 2151.

Plaintiff has the burden of proving the existence of a clearly established constitutional right. *Doe v. Petaluma City School District,* 54 F.3d 1447, 1450 (9th Cir.1995). It is the defendant's burden to show that a "reasonable ... officer could have believed, in light of the settled law, that he was not violating a constitutional or statutory right." *V-1 Oil Co. v. Smith,* 114 F.3d 854 (9th Cir.1997). Whether a right was clearly established and whether an official's conduct was reasonable are both questions of law for the court. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *ActUp!/Portland v. Bagley,* 988 F.2d 868, 873 (9th Cir.1993).

Because, as discussed below, plaintiff's wrongful arrest claim is precluded by *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), it is unnecessary for the court to consider whether defendants are entitled to qualified immunity on this claim.

For the excessive force claim, even though a fact issue exists, the court must still go through the analysis set out by the Supreme Court in *Saucier.* In *Saucier,* the Supreme Court reversed the Ninth Circuit's decision in *Katz v. United States,* 194 F.3d 962 (9th Cir.1999) and held that the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is distinct from the inquiry on the merits of the excessive force claim. *Saucier* implicitly overruled such Ninth Circuit cases as *Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir. 1997)(where court held that the inquiry is the same on both qualified immunity and the merits of an excessive force claim, because the same reasonableness requirement that applies on the merits applies to

qualified immunity), *Hervey v. Estes,* 65 F.3d 784, 791 (9th Cir.1995)(where court held that unreasonable force claims are generally questions of fact for a jury) and *Alexander v. County of Los Angeles,* 64 F.3d 1315, 1322 (9th Cir.1995)("The question of whether the officers are entitled to qualified immunity for any.use of excessive force in effecting the arrest is separate and distinct from whether they are entitled to qualified immunity for the alleged arrest without probable cause. This Court has observed that the inquiry as to whether officers are entitled to qualified immunity for the use of excessive force is the same as the inquiry on the merits of the excessive force claim."). But see *Hammer v. Gross,* 932 F.2d 842, 850 (9th Cir. 1991)(en banc), (in a holding closer to the later Supreme Court decision in *Saucier,* court rejected plaintiff's argument that an officer who has used unreasonable force cannot, by definition, have acted reasonably.)

■ The first prong of the *Saucier* test is met here. If the facts are viewed in the light most favorable to Ms. Ashley, Sutton's conduct violated a clearly established constitutional right. I turn, therefore, to the issue of whether Sutton and Gallaher have demonstrated that a reasonable officer could have believed, in light of the settled law, that his use of force on Ms. Ashley did not violate her constitutional right to be free from excessive force. On the facts of this case, if Ms. Ashley's version of the facts is believed, defendants have not carried their burden. I recommend that defendants' motion for summary judgment on the qualified immunity defense to Ms. Ashley's excessive force claim be denied.

### 4. Is the City liable?

The City moves against the three claims asserted against it, arguing that Ashley has established no policy or failure to train that would give rise to liability on the part of the City for Sutton's conduct.

As her third claim for relief, Ashley alleges that the City had an unofficial policy or practice which "promoted, allowed or facilitated officers to use coercion, threats and assault against detainees," based on their failure to answer questions, provide protected and privileged information, and failure to cooperate with police when not required to do so. Complaint ¶¶ 33, 34.

As her fourth claim for relief, Ashley alleges that the City had an inadequate policy for training officers with respect to detention, the rights of detainees and witnesses, and the use of force, including proper methods of arrest, handcuffing, and use of tasers. Complaint, ¶ 38.

As her fifth claim for relief, Ashley alleges that Sutton's actions were endorsed and approved by the Chief of Police, an official policymaker. Complaint ¶¶ 42, 43.

Congress intended the term "person" in § 1983 to include municipalities. *Christie v. Iopa,* 176 F.3d 1231, 1234 (9th Cir.1999). However, Congress did not intend to create respondeat superior liability, see *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), and isolated instances of official misconduct are insufficient to establish municipal liability under *Monell v. Dept. of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ There are three situations in which isolated constitutional violations are sufficient to establish a municipal "policy:" 1) the unconstitutional act was committed by a city employee pursuant to a formal governmental policy or longstanding practice or custom which constitutes standard operating procedure; 2) the unconstitutional act was committed by an official

with final policy-making authority, so that the challenged action constituted an act of official governmental policy; and 3) an official with final policy-making authority ratified a subordinate's unconstitutional action or decision and the basis for it. *Hopper v. City of Pasco,* 241 F.3d 1067, 1083 (9th Cir.2001).

■ Ashley has come forward with no evidence demonstrating that Sutton's conduct was pursuant to a formal governmental policy or longstanding practice constituting standard operating procedure. In fact, the evidence shows that Sutton's conduct in detaining Ashley and arresting her for refusing to answer questions was contrary to the requirements of the Milton–Freewater police manual. The City is entitled to summary judgment on Ashley's third claim for relief.

Nor has Ashley come forward with any evidence demonstrating that the City failed to train its police officers adequately with respect to detentions and the use of force. The City is entitled to summary judgment on Ashley's fourth claim for relief.

■ The City is not entitled to summary judgment on Ashley's fifth claim for relief, which is grounded on Gallaher's ratification of Sutton's conduct with respect to both the detention and the use of force. As Chief of Police, Gallaher is a policymaker for the City on police matters; his ratification of Sutton's conduct is sufficient to make the City liable on the basis of a municipal policy. *Larez,* 946 F.2d at 646–47 (evidence that Chief of Police, an authorized policymaker on police matters, ratified a decision that deprived plaintiff of a constitutional right, suffices for official liability under *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) and "fate of the City hinges on" Police chief's official capacity liability). See also *City of St. Louis v.*

*Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality) and *Christie,* 176 F.3d 1231 (9th Cir.1999)(to show ratification, plaintiff must prove authorized policymaker approves subordinate's decision and the basis for it). Accordingly, the City can be liable for actions taken by Sutton that lead to a finding of liability on the excessive force claim that were ratified by Gallaher as a policymaker. The City's motion for summary judgment on Ashley's fifth claim for relief should be denied.

**5. Are plaintiff's claims barred by *Heck v. Humphrey?***

■ Under *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court announced a new "favorable termination rule" for § 1983 claims by prisoners:

[I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by action whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486–87, 114 S.Ct. 2364. Thus, if a criminal conviction arising out of the same facts still stands and is fundamentally inconsistent with the conduct for which § 1983 damages are sought, the § 1983 action must be dismissed. *Smithart v. Towery,* 79 F.3d 951, 952 (9th Cir.1996).

■ The defendants argue that this case falls squarely within the following discussion in *Heck:*

[A] § 1983 action that does not seek damages directly attributable to convic-

tion or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful—would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest. [Citations omitted] He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable searches. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata, see n. 2, *supra,* the § 1983 action will not lie.

*Heck,* 512 U.S. at 487 n. 6, 114 S.Ct. 2364. Defendants argue that because Ashley was convicted of resisting arrest and disorderly conduct, her § 1983 claim based on wrongful arrest would necessarily imply the invalidity of her convictions.

Under Oregon law, a person commits the crime of resisting arrest if the person "intentionally resists a person known by the person to be a peace officer ... in making an arrest." Or.Rev.Stat. § 162.315(1). Further, a person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person: (a) engages in fighting or in violent, tumultuous or threatening behavior.... Or.Rev.Stat. § 166.025(a).

Ashley counters that her conviction for resisting arrest does not establish that Sutton's actions in arresting her were lawful, because Or.Rev.Stat. § 162.315(3) provides:

(3) It is no defense to prosecution under this section that the peace officer ...

lacked legal authority to make the arrest or book the person.

 I do not find this argument persuasive, because under *Heck,* the plaintiff must show that her conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by the issuance of a writ of habeas corpus. It is not sufficient for her to show only that she was precluded from asserting a defense of unconstitutional seizure to the charge of resisting arrest.

The fact that Ashley's appeal of her convictions was ineffectual because of procedural flaws does not remove the *Heck* bar to her § 1983 claim. In *Guerrero v. Gates,* 442 F.3d 697, 704 (9th Cir.2006), and in *Cunningham v. Gates,* 312 F.3d 1148 (9th Cir.2002), the court held that the bar applies in situations where, as here, the plaintiff has failed to timely pursue her available remedies for obtaining reversal of her conviction.

The record before the court indicates that Ashley has appealed the dismissal of her direct appeal as untimely. But absent any evidence that her convictions have, as of now, been reversed or expunged, she cannot assert a § 1983 claim based on wrongful seizure because it would necessarily call into question her conviction for resisting arrest. I conclude that Ashley's wrongful seizure claim is barred by *Heck.*

But *Heck* does not necessarily preclude Ashley from pursuing her excessive force claim. The applicability of the *Heck* doctrine to this claim depends on whether, if Ashley proved that Sutton used excessive force against her, this would necessarily render one or both of her convictions for resisting arrest and disorderly conduct invalid. See *Sjogren v. City of Seaside,* 2007 WL 221869 at *6 (D.Or., Jan. 19, 2007).

The test for deciding this question is whether the criminal convictions arise out of the same facts and are fundamentally inconsistent with the excessive force claim. *Id.*, citing *Smithart*, 79 F.3d at 952. In particular, *Heck* does not bar alleged excessive force which is used before or after the conduct for which the plaintiff was convicted. *Id.*, citing *Smith v. City of Hemet*, 394 F.3d 689, 695–97 (9th Cir. 2005)(en banc).

As the court pointed out in *Sjogren*, there is no Oregon case or statute which would allow excessive force by the officer at the time of the arrest to negate an element of the crime of resisting arrest. Or.Rev.Stat. § 161.235 allows a police officer to use force only to the extent the officer reasonably believes it to be necessary in effectuating the arrest. The Oregon Supreme Court has observed that § 161.235 does not "state what the remedy for a violation of that statute by an officer might be." *State v. Wright*, 310 Or. 430, 434 n. 7, 799 P.2d 642 (1990). While the statute precludes a defense to wrongful arrest based on wrongful conduct by the arresting officer, see Or.Rev.Stat. § 162.315(3); see also *Wright*, 310 Or. at 434 n. 7, 799 P.2d 642. On the other hand, as the court said in *Sjogren*, a criminal defendant may use physical force reasonably necessary under the circumstances to defend herself against any excessive force used by the arresting officer. *Wright*, 310 Or. at 435–36, 799 P.2d 642.

As was the case in *Sjogren*, there are several events in this case which, together or separately, could have constituted the basis for Ashley's conviction for resisting arrest. These include walking away from Sutton in the hallway and heading toward the gym, ignoring a command to stop, continuing to walk away after Sutton grabbed her coat, falling into the bleachers, rising from the bleachers and walking away from Sutton and toward the hallway, grabbing the taser, and removing it from her stomach. On this record, it is impossible to determine whether Ashley's conviction for resisting arrest arose from the same facts as the alleged excessive force. If all reasonable inferences from the evidence are drawn in Ashley's favor, I cannot conclude as a matter of law that her success on the excessive force claim would necessarily invalidate her conviction for resisting arrest.

With respect to the disorderly conduct conviction, as Ashley points out, because the jury made no special findings and the trial was not recorded, there is no evidence of the factual basis for the conviction, and therefore no evidence in the record which demonstrates that success on the excessive force claim would necessarily imply or demonstrate that the conviction for disorderly conduct was invalid. See *Smith*, 394 F.3d at 695

I conclude that defendants are entitled to summary judgment under *Heck* as to the § 1983 claim based on wrongful seizure, but not as to the claim based on excessive force.

**6. Can the battery claim be maintained?**

Defendants move for summary judgment in their favor on the battery claim. Ashley has not moved for summary judgment in her favor on this claim.

Defendants assert that Billie Ashley was not the victim of battery because she was "actively resisting Officer Sutton and he used reasonable force to overcome her resistance." Defendants' Memorandum p. 23. Defendants quote Oregon law:

A peace officer is justified in using physical force upon another person only when and to the extent that the peace

officer reasonably believes it is necessary . . . [t]o make an arrest.

Or.Rev.Stat. § 161.235(1).

A peace officer making a stop may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer, the person stopped or other persons who are present.

Or.Rev.Stat. § 131.605(5).

 Defendants argue that physical violence by an arresting officer that is no more than necessary to accomplish a legitimate arrest is "justified, as a matter of law, and there [is] no question to submit to the jury as to the cause alleging assault and battery," quoting *Gigler v. City of Klamath Falls,* 21 Or.App. 753, 763, 537 P.2d 121 (1975).

The evidence is such that a reasonable jury could return a verdict for either party on this claim. I conclude, therefore, that a genuine issue of material fact exists and that summary judgment for defendants is unwarranted.

### Conclusion

I recommend that plaintiff's motion for partial summary judgment (doc. # 17) and defendants' motion for summary judgment (doc. # 21) be granted and denied as follows:

1) that plaintiff's wrongful arrest claim (claim two) be dismissed, as precluded by *Heck v. Humphrey;*

2) that claims three and four against the City be dismissed because Ms. Ashley has offered no evidence of policy or custom; and

3) that all other motions for summary judgment, on the excessive force and battery claims, and on the qualified immunity defense, be denied.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 13, 2007. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 27, 2007, and the review of the Findings and Recommendation will go under advisement on that date.